# In the United States Bankruptcy Court
## for the
## Southern District of Georgia
### Savannah Division

**FILED**
Lucinda B. Rauback, Clerk
United States Bankruptcy Court
Savannah, Georgia
*By DReese at 11:51 am, Jun 07, 2017*

In re:

MABLETON, LLC,

    *Debtor.*

)
)
)
)
)
)
)

Chapter 11

Case No. 15-40124-EJC

## OPINION ON CONFIRMATION OF DEBTOR'S SECOND AMENDED PLAN OF REORGANIZATION

Pending before the Court is the Second Amended Plan of Reorganization (the "Second Amended Plan") (dckt. 466) filed by Mableton, LLC (the "Debtor"), which was scheduled for confirmation on February 28, 2017. This Chapter 11 reorganization case involves the Debtor's ownership and leasing of residential property, including a 50-unit (25 duplexes) development located in Rincon, Georgia (the "Mableton Complex"). The Debtor's principal creditor, Rincon Investors, LLC ("Rincon"), holds a first priority lien on the Mableton Complex, as well as all rents generated from such property.

The Debtor's Second Amended Disclosure Statement (dckt. 347) was approved by this Court on October 13, 2016, over the objection[1] of Rincon. (Dckt. 354). Pursuant to the Court's order (dckt. 355), on October 17, 2016, the Debtor served its Second Amended Disclosure Statement, its Amended Plan of Reorganization (the "Amended Plan") (dckt.

---

[1]This case has been vigorously litigated between Rincon and the Debtor. In total, sixteen (16) hearings have been held to date.

319), and the approved form of ballot (dckt. 354-1) on creditors, advising them that the matter was scheduled for confirmation on November 18, 2016. On October 21, 2016, Rincon filed its ballot rejecting the Amended Plan. (Dckt. 361).

As the case progressed towards the scheduled confirmation hearing, Rincon began to pursue a new strategy – proposing a competing plan. On November 2, 2016, Rincon filed a competing Chapter 11 plan (the "Competing Plan") (dckt. 378) under which Rincon would be permitted to foreclose on the Mableton Complex. With the exception of the claim held by Roger Macomber ("Macomber")[2], the Competing Plan provides for the payment in full of all other creditors upon confirmation. Further, the Competing Plan proposes to pay all of the administrative expenses (most notably the roughly $100,000.00 in attorney's fees to the Debtor's counsel) at confirmation. Faced with competing plans, the Court held a status conference on November 8, 2016, and entered an order (dckt. 394) which had the effect of allowing the Debtor's plan to proceed to confirmation prior to consideration of Rincon's Competing Plan.

On December 1 and 2, 2016, the Court held a confirmation hearing on the Debtor's Amended Plan. At the conclusion of the hearing, the Court announced its intention to deny confirmation based largely on the Debtor's proposed "cramdown" interest rate of

---

[2]Macomber holds a claim in the amount of $600,000.00 that has been bifurcated in the Competing Plan into two components: (1) a claim of $100,000.00 purportedly secured by the roads at the Mableton Complex; and (2) a claim of $500,000.00 secured by a second priority lien on the Mableton Complex. As addressed below, Rincon's plan provides that Macomber's $100,000.00 claim will be paid in full after five years and his $500,000.00 claim will be paid over a 30-year period. (Dckt. 522).

3.5%, which was equal to the prime rate[3] at the time of the hearing. The Court entered its order denying confirmation on January 10, 2017. (Dckt. 457). Shortly thereafter, on January 20, 2017, the Debtor filed the instant Second Amended Plan (dckt. 466) and the Court scheduled a confirmation hearing for February 28, 2017.

At this second confirmation hearing, the Court heard testimony from Edward A. Coleman, the Debtor's sole member, and his wife, Darnett Coleman. In addition, the Court heard testimony from two accountants, Lee Kessler and Austin York, with regard to both the feasibility of the Second Amended Plan and, to a lesser extent, the issue of an appropriate "cramdown" interest rate.

Based on the testimony and evidence presented at the February 28, 2017 hearing, as well as the Court's review of the evidence in the record from prior hearings, the Court finds that the Debtor has met its burden of proof on all but one of the requirements of 11 U.S.C. § 1129 necessary to confirm this cramdown plan. Specifically, the Second Amended Plan does not satisfy § 1129(a)(9)[4] because it fails to explicitly provide that administrative claims, unless otherwise agreed to by the holders of such claims, will be paid in full on the effective date of the plan. However, the Court will allow the Debtor to amend its plan to satisfy 11 U.S.C. § 1129(a)(9) and will enter an order confirming the Debtor's Second Amended Plan upon the filing of such an amendment.

---

[3] On December 15, 2016, the Federal Reserve raised the federal funds rate which resulted in an increase of the national prime rate to 3.75%. *See* Federal Reserve Statistical Release H-15 (Jan. 9, 2017), http://www.federalreserve.gov/releases/h15/.

[4] This being a cramdown plan, the requirements of 11 U.S.C. § 1129(a)(8) have not been met either, of course. *See* 11 U.S.C. § 1129(b)(1).

# I. JURISDICTION

This Court has subject-matter jurisdiction pursuant to 28 U.S.C. § 1334(a), 28 U.S.C. § 157(a), and the Standing Order of Reference signed by then Chief Judge Anthony A. Alaimo on July 13, 1984. This is a "core proceeding" within the meaning of 28 U.S.C. § 157(b)(2)(L).

# II. FINDINGS OF FACT

## A. Background

This case involves the reorganization of a simple business model, the leasing of residential properties. The Debtor owns a group of twenty-five (25) duplexes (i.e. the Mableton Complex) in a configuration resembling a residential neighborhood. The Debtor also owns a rental house located at 100 Seines Landing Drive, Springfield, Georgia ("Seines Landing"). (Dckt. 347, p. 6). The Debtor collects rents, services its substantial mortgages, and maintains the condition of the rental units from the cash flow of its business.

The real estate comprising the Mableton Complex, which will be the primary focus of this opinion, was originally purchased by Edward A. Coleman ("Edward") in 2006 and 2007. *Id*. On February 13, 2008, in connection with a financing arrangement with SunTrust Bank, Edward conveyed the Mableton Complex to the Debtor[5]. (Dckt. 237-3). As part of this arrangement, the Debtor signed a $2,509,682.58 commercial note with SunTrust Bank which was secured by the Mableton Complex and all rents and revenues related thereto.

The Debtor's primary creditor, Rincon, acquired the commercial note on

---

[5]The Debtor, a limited liability company, was formed by Edward, its sole member, in early 2008. (Dckt. 347, p. 6).

AO 72A
(Rev. 8/82)

December 15, 2014. (Dckt. 237-14). Prior to filing this case, the Debtor owed $369,262.68 in real estate taxes to Effingham County on the Mableton Complex. A judicial tax sale was scheduled for February 2015. On or about January 27, 2015, Rincon paid the real estate taxes, which included taxes through 2014. Not long after purchasing the loan, Rincon began foreclosure proceedings, which led to the Debtor filing the instant Chapter 11 case on January 29, 2015. (Dckt. 347, p. 6).

Since the Debtor filed its Chapter 11 bankruptcy petition, the Debtor and Rincon have litigated numerous issues, starting with the Debtor's use of cash collateral – to date, the Court has entered eight (8) cash collateral orders. The Debtor objected, unsuccessfully, to Rincon's claim as being in violation of the Commodities Exchange Act (7 U.S.C. §§ 1-27) and Georgia's "bucket shop" law (O.C.G.A. § 13-9-3). (Dckts. 210, 303). Early in the case, Rincon sought the appointment of a Chapter 11 trustee based on allegations of gross mismanagement and a failure to cooperate in discovery. (Dckt. 159). Rincon also disputed the claims asserted by various unsecured creditors. (Dckts. 362-370). Finally, the Court held a lengthy hearing to determine the value of the Mableton Complex. Along the way, various discovery disputes had to be resolved by the Court. (Dckts. 193, 195, 197). Not surprisingly, the confirmation process in this case has been equally contentious.

B. The Debtor's First Attempt at Confirmation

1. Approval of the Disclosure Statement

On June 5, 2015, the Debtor filed its Disclosure Statement (dckt. 125) and Chapter 11 Plan of Reorganization (dckt. 126). On July 8, 2015, Rincon objected to the Debtor's Disclosure Statement disputing, among other things, the Debtor's proposed

valuation of the Mableton Complex. (Dckt. 144). On April 26, 2016[6], the Court held a hearing to determine the value of the Mableton Complex. After considering testimony from three expert appraisers, the Court determined that the Mableton Complex had a value of $2,480,000.00 as of the petition date[7]. (Dckt. 301).

On June 16, 2016, the Debtor filed its Amended Disclosure Statement (dckt. 318) and Amended Plan (dckt. 319) to address Rincon's objections and to adopt the Court's valuation of the Mableton Complex. On July 29, 2016, Rincon objected to the Debtor's Amended Disclosure Statement because it failed to provide a valuation of additional collateral securing Rincon's claim – namely, the rents (i.e. cash collateral) generated by the Mableton Complex. (Dckt. 337). The Court held a hearing to determine the sufficiency of the Amended Disclosure Statement on August 19, 2016. At the hearing, the Court directed the Debtor to further amend its disclosure statement to address the new objections raised by Rincon.

On September 13, 2016, the Debtor filed its Second Amended Disclosure Statement (dckt. 347), which was approved by the Court on October 13, 2016. (Dckt. 354). As a result, the Debtor began soliciting acceptances and rejections of its Amended Plan (dckt. 319). The Court set November 14, 2016, as the last day for filing written acceptances or

---

[6]Between the filing of Rincon's July 8, 2015 objection to the Disclosure Statement and this April 26, 2016 hearing, the parties pursued discovery on one or more contested matters, including the valuation of the Mableton Complex. (Dckt. 176).

[7] The parties later agreed to use this valuation of the Mableton Complex for purposes of confirmation. *See In re South Side House,* LLC, 474 B.R. 391 (Bankr. E.D.N.Y. 2012) (finding that the valuation of collateral, for purposes of confirmation, should be done at a time on or near confirmation).

rejections of the Debtor's Amended Plan and scheduled a confirmation hearing for December 1, 2016. (Dckts. 354, 356).

### 2. Rincon's Competing Plan

On November 2, 2016, sixteen (16) days after balloting had begun on the Debtor's Amended Plan, Rincon filed its Competing Plan. (Dckt. 378). The principal feature of Rincon's plan is that it calls for the liquidation of the Mableton Complex[8]. The Competing Plan also provides that all claims, except for the claim held by Macomber, will be paid in full upon confirmation. Prior to filing its plan, Rincon did not file a disclosure statement as contemplated by 11 U.S.C. § 1125[9]. Instead, Rincon attempted to incorporate within the body of its plan, some, but not all, of the Debtor's previously approved Amended Disclosure Statement. On November 8, 2016, the Court held a status conference to discuss whether Rincon must file its own disclosure statement and whether the Court should schedule confirmation of the Competing Plan in conjunction with confirmation of the Debtor's Amended Plan.

After the status conference, on November 10, 2016, the Court entered an order pursuant to 11 U.S.C. § 105(d) requiring Rincon to file and seek approval of its own disclosure statement. (Dckt. 394). In addition, the Court decided to proceed with the

---

[8] Article III of Rincon's Competing Plan provides: "The Class 1 allowed secured claim of Rincon Investors shall be satisfied in part by return of the collateral by Debtor to Rincon Investors, LLC. On or after the Effective Date of the Plan, Rincon Investors, LLC shall be permitted to foreclose on the Mableton Complex pursuant to its Loan Documents." (Dckt. 378, p.9).

[9] Section 1125(b) of the Bankruptcy Code requires that a disclosure statement be approved by the court before a plan proponent may solicit acceptances and rejections of its proposed plan. 11 U.S.C. § 1125(b).

AO 72A
(Rev. 8/82)

scheduled confirmation hearing on the Debtor's Amended Plan, but allowed Rincon to proceed with seeking approval of its separate disclosure statement[10]. *Id.*

### 3. The First Confirmation Hearing

On December 1 and 2, 2016, the Court held a confirmation hearing on the Debtor's Amended Plan. At the hearing, Rincon objected to confirmation on several grounds, including: 1) the valuation of Rincon's cash collateral; 2) the lack of feasibility; 3) the Debtor's lack of good faith; and 4) the inadequacy of the proposed "cramdown" interest rate.

On January 10, 2017, the Court entered an order denying confirmation of the Amended Plan because it failed to meet the cramdown requirements of 11 U.S.C. § 1129(b) with respect to Rincon's secured claim. (Dckt. 457). More specifically, the Court found that the Debtor's proposed cramdown interest rate of 3.5%, which was equal to the national prime rate as of the December 1, 2016 confirmation hearing, did not provide for the "fair and equitable" treatment of Rincon's claim. *Id.* However, the Court granted the Debtor an opportunity to amend its plan to propose a cramdown interest rate that provided for a risk adjustment above the national prime rate in accordance with the Supreme Court's decision in *Till v. SCS Credit Corp.,* 541 U.S. 465 (2004). *Id.*

---

[10]Since entry of the Court's November 10, 2016 order, Rincon has made two attempts to have its own disclosure statement approved by the Court. Rincon's first disclosure statement (dckts. 423, 440) was met by certain well-taken objections from the Debtor (dckt. 454) and its second disclosure statement (dckt. 464) was met by a well-taken objection by Macomber (dckt. 508). Rincon filed a third disclosure statement (dckt. 521) on March 24, 2017, which has not yet been approved by the Court.

AO 72A
(Rev. 8/82)

C. The Debtor's Second Amended Plan

*1. Classification and Treatment of Claims*

On January 20, 2017, the Debtor filed its Second Amended Plan, which creates the following six classes: Class 1 containing the secured claim of Rincon; Class 2 containing the secured claim of Janice Erickson; Class 3 containing the $0.00 tax claim of the Internal Revenue Service; Class 4 containing unsecured claims of $10,000.00 to $99,999.99; Class 5 containing unsecured claims of $9,999.99 or lower; and Class 6 containing the secured claim[11] of Roger Macomber. (Dckt. 466).

Under the Second Amended Plan, the Debtor provides two payment alternatives for Rincon's secured claim[12]. (Dckt. 466, p. 6). Alternative "A" provides that Rincon's secured claim will be paid in full at 5.25% interest per annum in 240 equal monthly installments of $17,126.72[13] with the first payment due thirty days after the plan's effective date. *Id.* Alternative "B" provides that Rincon's secured claim will be paid at 4.75% interest

---

[11]Macomber made the election pursuant to 11 U.S.C. § 1111(b) to have his $600,000.00 claim deemed fully secured, and the Debtor previously agreed to such treatment in a stipulation. (Dckt. 124).

[12] Under both alternatives, the Debtor will pay Rincon a lump sum payment of $34,961.00 on the plan's effective date if the Court determines that such funds are a part of Rincon's cash collateral. The Court does find that the funds, which are comprised of pre-petition rents collected from the Mableton Complex, are Rincon's cash collateral. *See infra* Section III(A).

[13]The monthly payments provided to Rincon are based on an estimated amount of $2,555,000.00 for Rincon's claim. The Debtor stipulated that the unpaid balance of Rincon's claim as of February 28, 2017 was $2,419,257.25. (Dckt. 525). Because the Court has not yet ruled on Rincon's § 506(b) application, the exact amount of Rincon's claim is uncertain at this time, but will be no greater than $2,598,758.24, which the Court finds to be the value of Rincon's collateral. The Court recognizes that the monthly plan payments to Rincon will increase slightly if the amount of Rincon's claim is set at $2,598,758.24.

per annum amortized over twenty (20) years and paid in equal monthly installments of $16,511.01, with the first payment due thirty days after the plan's effective date. (Dckt. 466, p. 6). Under Alternative "B", the Debtor will make a final balloon payment on the remaining balance of Rincon's claim after ten years. *Id.* If Rincon fails to provide timely notice of its choice of payment alternative, the Debtor will pay Rincon pursuant to Alternative "A." *Id.*

The Second Amended Plan provides that Janice Erickson's claim will be paid in full at 3.0% interest in 360 equal monthly installments of $721.28, with the first payment due thirty days after the plan's effective date. (Dckt. 466, p. 6). In addition, Erickson's pre-petition arrearage claim of $721.28 will be paid in four monthly installments of $180.32. *Id.*

The Second Amended Plan provides that Class 4 unsecured creditors will be paid a lump sum payment of $38,000.00 on the plan's effective date. (Dckt. 466, p. 7). The remainder of the Class 4 creditors' claims will be paid in full at 3.75% interest in 180 equal monthly installments of $568.81, with the first payment due thirty days after the plan's effective date. *Id.* The Second Amended Plan provides for similar treatment for Class 5 unsecured creditors. First, the Debtor will make a lump sum payment of $12,000.00 on the plan's effective date. *Id.* The remainder of the Class 5 creditors' claims will be paid in full at 3.75% interest in 60 equal monthly installments of $229.17, with the first payment due thirty days after the plan's effective date. *Id.* All distributions to Class 4 and Class 5 creditors will be made on a pro rata basis. *Id.*

The Second Amended Plan provides for bifurcated treatment of Roger

Macomber's claim. First, the Debtor proposes to pay $100,000.00[14] of Macomber's claim at 3.25% interest in 240 equal monthly installments of $567.20, with the first payment due thirty days after the plan's effective date. (Dckt. 466, p. 8). Second, the plan provides that "[t]he $500,000.00[15] portion of [Macomber's] claim . . . shall be deemed contingent" because it will be paid by third parties as described below. *Id.*

### 2. Third-Party Contributions

Edward, the Debtor's sole member, and his wife, Darnett Coleman ("Darnett"), own several other businesses, namely Coastal Properties, LLC, Liberty Auto Shine, LLC and Auto Shine Properties, LLC (collectively, "Auto Shine")[16]. The Second Amended Plan provides that Edward and Auto Shine will contribute to the plan payments as follows:

> 1) Edward, individually, shall sign a promissory note payable to the Debtor in the amount of $50,000.00 to resolve any potential preference or fraudulent transfer claims against him by the Debtor. (Dckt. 347-11). The funds necessary to satisfy the promissory note will be paid to the Debtor on or before confirmation and will be used to pay the $38,000.00 and $12,000.00 lump sum payments to Class 4 and Class 5 creditors, respectively.

> 2) Edward and Darnett, who currently manage the Mableton Complex, will agree to waive their $2,170.00 monthly management fee in any month that such funds are needed by the Debtor to make payments under the confirmed

---

[14] This portion of the claim is represented by a promissory note dated January 24, 2013, in the original principal amount of $100,000.00. (Dckt. 124). This note is purportedly secured by a first priority lien in the roads in the Mableton Complex. *Id.* A neighboring property owner has filed a declaratory judgment action in state court to declare that the roads are public roads, dedicated to the county by Macomber *before* he conveyed them to the Debtor.

[15] This portion of the claim is represented by a promissory note dated May 1, 2014, in the original principal amount of $500,000.00. (Dckt. 124). This note is secured by a second priority lien on the Mableton Complex. *Id.*

[16] Through the Auto Shine entities, the Colemans operate six car washes in Savannah, Georgia and the surrounding area.

plan.

3) To resolve any potential preference or fraudulent transfer claims against it, Auto Shine will sign a promissory note payable to the Debtor in the amount of $100,000.00 at 3.5% interest with monthly payments of $830.81. (Dckt. 347-11). These funds will be used to make the plan payments due to Class 4 and Class 5 creditors, as well as a portion of the plan payments due to Rincon, until the promissory note has been paid in full. Should Auto Shine default in making payments due under its promissory note (more than thirty days late), the Debtor shall make the payments due to creditors.

4) Either Edward, individually, or Auto Shine[17] will continue to make monthly payments of $1,666.67 on the $500,000.00 portion of Macomber's claim as previously stipulated to by the parties[18]. In the event of a default in payment (more than thirty days late), the Debtor shall be responsible for said payments.

(Dckt. 466).

   *3. Voting*

   On January 26, 2017, the Court entered an order allowing the Debtor to begin balloting of its Second Amended Plan and set the last day for filing written acceptances or rejections of the plan as February 23, 2017. (Dckt. 472). All of the Debtor's impaired creditors[19] filed an acceptance or rejection of the Second Amended Plan. Class 1 (Rincon) voted to reject the Second Amended Plan. (Dckt. 505). Class 2 (Janice Erickson) voted to

---

   [17] The $500,000.00 promissory note with Macomber is co-signed by Edward and guaranteed by Auto Shine. (Dckt. 466, p. 8).

   [18] The Debtor's stipulation with Macomber provided that either Edward or Auto Shine will make 300 equal monthly installments of $1,666.67 beginning September 1, 2015 and continuing on the first of each month until the $500,000.00 promissory note is paid in full. (Dckt. 124) According to Darnett, Auto Shine has made all payments due to Macomber since September 1, 2015.

   [19] Class 3, comprised of the $0.00 tax claim held by the IRS, is not impaired under the Second Amended Plan, and thus is conclusively presumed to have accepted the plan. *See 11* U.S.C. § 1126(f).

accept the Second Amended Plan. (Dckt. 503). All of the unsecured creditors in Class 4 voted to accept the Second Amended Plan. (Dckts. 492-94). All of the unsecured creditors in Class 5 voted to accept the Second Amended Plan. (Dckts. 495-500). Class 6 (Roger Macomber) also voted to accept the Second Amended Plan. (Dckt. 507).

### 4. The Second Confirmation Hearing

The Court's January 26, 2017 order scheduled a confirmation hearing on the Second Amended Plan for February 28, 2017. (Dckt. 472). On February 23, 2017, Rincon filed an objection to the Debtor's Second Amended Plan (dckt. 506), again arguing that the Debtor's plan is not feasible and still does not provide Rincon with a sufficient "cramdown" interest rate. The Court conducted an evidentiary hearing on confirmation of the Debtor's Second Amended Plan on February 28, 2017. The following witnesses testified for the Debtor: Edward, Darnett and Lee Kessler (the Debtor's accountant). The only witness who testified for Rincon was Austin York (accountant/expert). Below, the Court will set forth its findings from the relevant testimony of each witness[20].

### a. Darnett Coleman

The Court first heard testimony from Darnett who serves as the bookkeeper for the Debtor and Auto Shine. Darnett testified as to the Debtor's ability to make its plan payments as well as Auto Shine's ability to make the proposed third-party contributions. Based on the Debtor's financial performance during the two years it has been in bankruptcy, Darnett testified that the Debtor would be able to make all plan payments without the need

---

[20]Each of these witnesses also testified at the December 1 and 2, 2016 confirmation hearing on the Debtor's Amended Plan.

for third-party contributions. Darnett further testified that if it was necessary for Autoshine to make the proposed third-party contributions, it could do so without experiencing a financial hardship.

Darnett testified that the Debtor, since filing for bankruptcy, has paid all of its monthly operating expenses, all of its post-petition obligations to secured creditors and has accumulated nearly $100,000.00 in its bank accounts (excluding security deposits). (2/28/17 Hrg., Ex. D-1). Further, Darnett stated that she expects the Debtor's revenues to continue to increase because the Debtor has begun the process of increasing the monthly rental rate for new tenants at the Mableton Complex to $925.00.

Darnett also testified as to Auto Shine's ability to make the third-party contributions proposed in the Second Amended Plan. Darnett stated that Auto Shine has not experienced any financial hardship despite paying, in addition to its regular operating expenses: the $1,666.67 monthly payment on the $500,000.00 portion of the debt owed to Macomber (2/28/17 Hrg., Ex. D-8); approximately $65,000.00 in attorney's fees for the Debtor and Edward (2/28/17 Hrg., Ex. D-9, D-10); the Colemans' $2,000.00 monthly mortgage payment; and an $800 weekly salary to both Edward and Darnett. According to Darnett, an additional monthly payment of $830.81 per month as proposed in the Second Amended Plan would have a minimal financial impact on Auto Shine. In fact, Darnett testified that Auto Shine will be increasing its prices at the car washes in 2017, and she expects the projected increase in revenues to easily cover the additional monthly payment.

### b. Edward Coleman

The Court also heard from Edward regarding the feasibility of the proposed third-party contributions. First, Edward testified that he has already fulfilled his obligation under the Second Amended Plan by signing the settlement agreement with the Debtor, as well as the $50,000.00 promissory note. (2/28/17 Hrg., Ex. D-13). In addition, Edward testified that all of the $50,000.00 necessary to satisfy the note is currently held in trust by Debtor's counsel. With regard to Auto Shine's third-party contributions, Edward testified that Auto Shine has received a letter of commitment from The Bank of Newington approving a letter of credit to Auto Shine in the amount of $100,000.00. (2/28/17 Hrg., Ex. D-12). According to Edward, these funds would be available to satisfy Auto Shine's third-party contributions in the event Auto Shine does not have sufficient funds to do so.

### c. Lee Kessler

The Debtor's accountant, Lee Kessler, prepared a five-year financial projection for the Debtor based on its monthly operating reports and past performance while in Chapter 11. (2/28/17 Hrg., Ex. D-14). To determine the Debtor's projected income, Kessler used an initial monthly rental rate of $850.00 per unit[21], which he found reasonable based on the current rental rates at the Mableton Complex and the Debtor's proposed increase of such rates. As a result, Kessler projected a monthly revenue of $40,517.50[22] for the Debtor in

---

[21] Currently, only 48 out of the 50 units at the Mableton Complex are available for rent. One of the units is used as an office and another unit is provided rent-free to the property's handyman. Kessler's projections include rents for the unit being used as an office because the Colemans testified that they intend to convert the office into a rentable unit in the near future.

[22] This figure reflects a vacancy rate of 5% at the Mableton Complex and includes $1,000.00 of rental income from the Debtor's Seines Landing property.

2017. *See infra* Table 1.

To estimate the Debtor's expenses, Kessler relied primarily on the Debtor's monthly operating reports over the two-year period in which the Debtor has been in bankruptcy. Kessler did not give any weight to the Debtor's pre-petition expenses because he felt that any mismanagement that occurred pre-petition has not continued post-petition and would not continue in the future[23]. These expenses included payments to employees of Auto Shine for work performed at the Mableton Complex and various personal expenses of the Colemans. In addition, Kessler did not include the Colemans' $2,170.00 management fee as an expense because the Colemans intend to waive such fee if such funds are needed by the Debtor to make its plan payments. Ultimately, Kessler projected that the Debtor would incur monthly operating expenses of $16,336.00 in 2017. *Id.* In addition to operating expenses, Kessler testified that the Debtor would need to reserve $2,500.00 per month for capital expenditures (e.g. roof repair, HVAC replacement). (2/28/17 Hrg., Ex. D-14).

Based on these projections, Kessler testified that Debtor would generate a monthly net cash flow of $21,681.50 in 2017, which would be sufficient to cover all of the Debtor's proposed plan payments *without* the need for third-party contributions. Further, Kessler projects that the Debtor's monthly cash flow will continue to exceed its proposed

---

[23]Prior to the Debtor filing for bankruptcy, the day-to-day management of the Mableton Complex was performed by an employee. In addition, the Colemans routinely moved cash between Auto Shine and Mableton to pay for various expenses. Since filing for bankruptcy, the Colemans have managed the Mableton Complex and testified that they will continue to do so in the future. Further, the Colemans have stopped co-mingling the revenues of Mableton and Auto Shine.

plan payments at least until 2021[24]. The Court finds Kessler's testimony credible in all respects.

### d. Austin York

Rincon called Austin York as an expert witness to refute the feasibility of the Debtor's Second Amended Plan. York is a Certified Public Accountant and Certified Financial Planner with Dabbs, Hickman, Hill & Cannon, LLP in Savannah, Georgia. York was retained by Rincon to review the Debtor's financial records and to prepare his own financial projections for the five-year period after confirmation. (2/28/17 Hrg., Ex. RI-20). York undertook to create his projections by using some of the Debtor's figures and making various adjustments.

To determine the Debtor's projected revenue, York analyzed the rent rolls for each of the thirteen (13) months preceding the February 28, 2017 confirmation hearing to calculate an average monthly rental rate of $816.00 per unit. Using this method, York projected that the Debtor would generate a monthly rental revenue of $38,601.00[25] in 2017. *Id.* York's projections provide for a slight increase (ranging from 3% to 5%) in the Debtor's monthly rental income over the remaining four years due to the Debtor's proposal to increase the monthly rental rate at the Mableton Complex. *See infra* Table 2.

To determine the Debtor's projected expenses, York utilized a weighted

---

[24]Kessler only provided financial projections for 2017 to 2021.

[25] Unlike Kessler, York used only 48 rental units to calculate the Debtor's monthly rental revenue from the Mableton Complex. In addition, York provided for a vacancy rate of 4% and included $1,000.00 of rental income from the Debtor's Seines Landing property.

AO 72A
(Rev. 8/82)

average for most expenses, placing a 25% weight on the Debtor's three years preceding bankruptcy and a 75% weight on the two years it has been in bankruptcy. York testified that he employed this methodology because he did not think it appropriate to completely ignore the past and that he must give some consideration to the Debtor's prior history. As a result, York included several expenses that were not reflected in Mr. Kessler's projections, but were regularly incurred by the Debtor prior to filing for bankruptcy. These expenses include finance charges ($134.50 beginning in 2018 and increasing slightly thereafter), meals and entertainment ($63.00), and wages paid to Auto Shine employees for work performed at the Mableton Complex ($989.00). (2/28/17 Hrg., Ex. RI-20). In addition, York included two other significant monthly expenses: $2,170.00 for the management fee for the Mableton Complex and $3,378.00 (for a period of three years) to cover the Debtor's obligation to pay its administrative expenses incurred in the bankruptcy. *Id.* Ultimately, York projected that the Debtor would incur monthly operating expenses of $22,776.00 in 2017. *Id.* As with Kessler's projections, York's projections provided for a monthly $2,500.00 capital expenditure reserve.

Based on these projections, York testified that the Debtor's net cash flow of $13,325.00 per month in 2017 would be insufficient to cover the monthly plan payments under Alternative "A" ($21,150.17) or Alternative "B" ($20,444.46) of the Second Amended Plan. *Id.* York does project that the Debtor will improve its net cash flow over the next five years, but not enough to make its proposed plan payments. *Id.*

### 5. Comparison of the Experts' Financial Projections

The following is a summary of the 2017 monthly revenue and expense projections provided by Kessler and York:

Table 1: Comparison of the Experts' 2017 Monthly Financial Projections

| | **Kessler** | **York** |
|---|---|---|
| Mableton Rents (49 units v. 48 units) | $ 41,650.00 | $39,168.00 |
| Other (Seines Landing) | $ 1,000.00 | $ 1,000.00 |
| Vacancy Rate[26] | $ (2,132.50) | $ (1,567.00) |
| **Total Monthly Revenue** | **$ 40,517.50** | **$ 38,601.00** |
| | | |
| Advertising | $ 150.00 | $ 212.00 |
| Bank Fees | $ 40.00 | $ 77.00 |
| Insurance | $ 2,408.00 | $ 2,517.00 |
| Management Fees | $ 0.00 | $ 2,170.00 |
| Meals and Entertainment | $ 0.00 | $ 63.00 |
| Miscellaneous | $ 425.00 | $ 158.00 |
| Office Expenses | $ 75.00 | $ 552.00 |
| Accounting & Legal Fees | $ 1,400.00 | $ 333.00 |
| Administrative Fees | $ 0.00 | $ 3,378.00 |
| Repairs and Maintenance | $ 7,500.00 | $ 7,738.00 |
| Property Taxes | $ 2,738.00 | $ 2,739.00 |
| Trustee Fees | $ 0.00 | $ 325.00 |
| Utilities | $ 1,600.00 | $ 1,526.00 |
| Wages and Labor | $ 0.00 | $ 989.00 |

---

[26] Kessler used a 5% vacancy rate and York used a 4% vacancy rate.

| | | |
|---|---|---|
| **Total Monthly Operating Expenses** | **$ 16,336.00** | **$ 22,776.00** |
| **Net Monthly Income** | **$ 24,181.50** | **$ 15,825.00** |
| Capital Improvements Reserve | $ (2,500.00) | $ (2,500.00) |
| **Net Cash Flow Available** | **$ 21,681.50** | **$ 13,325.00** |

(2/28/17 Hrg., Exs. D-14, RI-20).

   For the remaining four years, the experts' projections indicate the following monthly net cash flow for the Debtor:

Table 2: Experts' Net Cash Flow Projections (2018-2021)

| | **2018** | **2019** | **2020** | **2021** |
|---|---|---|---|---|
| **Kessler** | $ 23,310.87 | $ 22,629.86 | $ 23,425.63 | $ 22,856.40 |
| **York** | $ 14,889.00 | $ 14,366.00 | $ 18,393.00 | $ 17,895.00 |

*Id.*

## III. CONCLUSIONS OF LAW

### A. The Value of Rincon's Collateral

   The Second Amended Plan provides an estimate of Rincon's claim and anticipates that the amount of Rincon's claim will have to be adjusted based on the Court's valuation of Rincon's collateral. (Dckt. 466, p. 5). If it is determined that the value of Rincon's collateral is greater than the amount of its claim, Rincon may be entitled to add reasonable attorney's fees to the amount of its claim, but only to the extent of the value of its collateral. *See* 11 U.S.C. § 506(b). Thus, as the Second Amended Plan contemplates, the exact amount of Rincon's claim cannot be determined until the Court first determines the

value of Rincon's collateral.[28]

At the February 28, 2017 confirmation hearing, the Debtor and Rincon agreed that the value of Rincon's collateral, for purposes of confirmation, is equal to the Court's $2,480,000.00 valuation of the Mableton Complex plus the value of any cash collateral (i.e. the Mableton Complex rents) in existence at the time of the confirmation hearing. The parties stipulated that as of the confirmation hearing the Debtor had $118,758.24[29] of funds in various bank accounts attributable to rents generated from the Mableton Complex. (Dckt. 525). However, the Debtor argued that a portion of these funds should not be included as part of Rincon's cash collateral.

The Debtor asserts that $34,961.00 of these funds, which are comprised of pre-petition rents from the Mableton Complex[30], are not Rincon's cash collateral because Rincon's security interest in the Mableton Complex rents was not enforceable under Georgia law at the time the Debtor filed for bankruptcy. Specifically, the Debtor contends that Rincon had no right to possession of the pre-petition rents because Rincon's Deed to Secure Debt conditioned the right to possess rents upon default by the Debtor and upon Rincon taking possession of the property, which had not occurred as of the petition date.

---

[28] Rincon has filed an application seeking to add reasonable attorneys' fees to its claim pursuant to 11 U.S.C. § 506(b) (the "Application"). (Dckt. 470). Once the Second Amended Plan is confirmed, the Court will set a hearing on Rincon's Application and the amount of Rincon's claim will be determined at that time.

[29] This figures excludes $45,431.36, which the parties agreed represented either income generated by the Seines Landing property, security deposits of tenants, or was not otherwise traceable to rents from the Mableton Complex. (Dckt. 525).

[30] These funds are currently being held by the Debtor in an escrow account.

The Bankruptcy Code defines the term "cash collateral" to mean "cash . . . whenever acquired in which the estate and an entity other than the estate have an interest . . . whether existing before or after commencement of a case under this title." 11 U.S.C. § 363(a). In determining whether a creditor has an "interest" (as it is used in § 363(a)) in pre-petition rents, several courts have held that the "perfection of [an interest in rents] under state law is sufficient in and of itself to satisfy the requirement of § 363." *In re Hall Colttree Associates*, 146 B.R. 675, 679 (Bankr. E.D. Va. 1992); *In re 1560 Wilson Boulevard L.P.*, 206 B.R. 819, 824 (Bankr. E.D. Va. 1996) ("There can be little doubt that where an assignment of rents has been properly recorded, rents collected by the debtor prepetition and held in an identifiable account constitute cash collateral even in the absence of an affirmative prepetition act to enforce direct collection of the rents.").

Because a perfected security interest in rents is sufficient to meet § 363(a)'s definition of an "interest", the Court need not address whether Rincon's interest in the Mableton rents was "enforceable" on the petition date. *In re Vienna Park Properties*, 976 F.2d 106, 112 (2nd Cir. 1992) ("The enforceability of an interest is an issue distinct from the issue of whether a security interest exists . . . . The failure of a secured party to perform enforcement procedures prior to bankruptcy merely renders an interest inchoate, not nullified." *In re Vienna Park Properties*, 976 F.2d 106, 112 (2nd Cir. 1992); *see also In re Resorts Inn, Inc.*, 2004 WL 2201252 at *4 (Bankr. S.D. Ga. Aug. 30, 2004) (J. Davis).

In this case, it is undisputed that Rincon held a properly perfected security interest in the Mableton Complex rents prior to the Debtor filing for bankruptcy.

Accordingly, the Court finds that the $34,961.00 of pre-petition rents currently held by the Debtor is part of Rincon's cash collateral, and thus the value of Rincon's collateral, for purposes of confirmation of the Second Amended Plan, is $2,598,758.24[31].

## B. General Confirmation Standards

In order for a Chapter 11 plan to be confirmed, the proponent of the plan has the burden of establishing the requirements enumerated in 11 U.S.C. § 1129(a)(1)-(16) by a preponderance of the evidence. *In re J.C. Householder Land Trust #1*, 501 B.R. 441, 447 (Bankr. M.D. Fla. 2013). One of these subsections – § 1129(a)(8) – requires that each impaired class of creditors accept the plan. However, the Bankruptcy Code provides that where all requirements for confirmation except § 1129(a)(8) are met, the bankruptcy court shall confirm a Chapter 11 plan "if the plan does not discriminate unfairly, and is fair and equitable, with respect to each class of claims or interests that is impaired under, and has not accepted, the plan." 11 U.S.C. § 1129(b)(1). "Confirmation under § 1129(b) is referred to as cramdown because the plan is permitted to go into effect over the objections of one or more impaired classes of creditors." *In re Future Energy Corp.*, 83 B.R. 470, 490 (Bankr. S.D. Ohio 1988). As will be discussed more fully below, the Debtor must satisfy the cramdown requirements of § 1129(b) with respect to Rincon's secured claim (Class 1) because it is an impaired class that has not accepted the Second Amended Plan.

---

[31]The value of Rincon's collateral is equal to the value of the Mableton Complex ($2,480,000.00) plus the value of Rincon's cash collateral ($118,758.24). This figure does not necessarily represent the amount of Rincon's claim. However, it does establish the maximum value of Rincon's claim. Section 506(b) only allows the Court to award Rincon reasonable attorneys' fees, if any, to the extent of the value of its collateral.

The Court has an independent duty to determine compliance with each of the Bankruptcy Code's confirmation requirements, including, if necessary, the cramdown requirements of § 1129(b). *In re Piper Aircraft Corp.*, 244 F.3d 1289, 1299-1300 n. 4 (11th Cir.2001) ("A court must independently satisfy itself that these criteria [in § 1129] are met. Thus, it must consider facts relating to these criteria even in the absence of an objection."); *In re Lett*, 632 F.3d 1216, 1229 (11th Cir. 2011). Accordingly, the Court will provide its analysis of each confirmation requirement applicable in this case.

### C. 11 U.S.C. § 1129(a)(1)

Section 1129(a)(1) requires that the Second Amended Plan comply with all of the applicable provisions of the Bankruptcy Code. The "legislative history of subsection 1129(a)(1) suggests that Congress intended the phrase 'applicable provisions' in this subsection to mean provisions of Chapter 11 that concern the form and content of reorganization plans . . . such as section 1122 and 1123, governing classification [of claims] and contents of plan[s]." *Kane v. Johns-Manville Corp. (In re Johns-Mansville Corp.)*, 843 F.2d 636, 648-49 (2nd Cir. 1988) (internal citations omitted).

There has been no suggestion that the Debtor's Second Amended Plan violates sections 1122 or 1123 of the Bankruptcy Code, and the Court concludes based on its independent review that the Second Amended Plan satisfies the requirements of 11 U.S.C. § 1129(a)(1).

### D. 11 U.S.C. § 1129(a)(2)

Section 1129(a)(2) requires the Court to find that "[t]he proponent of the plan

[has] complie[d] with the applicable provisions of the Bankruptcy Code." 11 U.S.C. § 1129(a)(2). The principal purpose of section 1129(a)(2) is to assure that the plan proponent, the Debtor in this case, has complied with the disclosure requirements of section 1125 in connection with the solicitation of acceptance of the plan. *In re Trans World Airlines, Inc.*, 185 B.R. 302, 313 (Bankr. E.D. Mo. 1995).

The Court previously approved the Debtor's Second Amended Disclosure Statement. (Dckt. 354). Further, the Court has not been provided with any evidence that the Debtor failed to comply with the Court's order regarding service of the approved Second Amended Disclosure Statement and solicitation of votes. Accordingly, the Court concludes that the Debtor has complied with the applicable provisions of the Bankruptcy Code as required by 11 U.S.C. § 1129(a)(2).

E. 11 U.S.C. § 1129(a)(3)

Section 1129(a)(3) requires that the Second Amended Plan be "proposed in good faith and not by any means forbidden by law." 11 U.S.C. § 1129(a)(3). The good faith requirement has been interpreted to mean "that there is a reasonable likelihood that the plan will achieve a result consistent with the objectives and purposes of the Code." *McCormick v. Banc One Leasing Corp. (In re McCormick)*, 49 F.3d 1524, 1526 (11th Cir.1995). In assessing whether the plan was proposed in good faith, the assessment is focused on the plan itself, while also considering the totality of circumstances surrounding the plan. *Id.* The good faith requirement is met when the plan is proposed with a "legitimate and honest purpose to reorganize and has a reasonable hope of success." *Id.*

The Court has not been presented with any evidence which indicates that the Second Amended Plan was filed by the Debtor for some other reason than to further a legitimate effort to reorganize or to preserve the Debtor's business as a going concern. Accordingly, the Court concludes that the Second Amended Plan was filed in good faith, and thus satisfies the requirements of 11 U.S.C. § 1129(a)(3).

F. 11 U.S.C. § 1129(a)(4)

Section 1129(a)(4) requires that all payments made, or to be made, by the Debtor for services or costs in connection with the case be approved by the Court as reasonable. 11 U.S.C. § 1129(a)(4). Article II of the Second Amended Plan discloses that the Court has already approved the following services or costs as reasonable: 1) $164,490.33[32] for the Debtor's attorneys; 2) $4,037.50[33] for the Debtor's accountant; and 3) $7,338.75 for the Debtor's appraisers. (Dckt. 466, p. 3). Further, the Second Amended Plan contemplates that any additional fees and expenses incurred by these professionals must be approved by the Court prior to payment by the Debtor. *Id.* Accordingly, the Court concludes that the requirements of 11 U.S.C. § 1129(a)(4) have been satisfied.

G. 11 U.S.C. § 1129(a)(5)

Section 1129(a)(5) requires that: (i) the plan proponent disclose the identity and affiliations of the proposed officers and directors of the reorganized debtor or any successor

---

[32] On March 7, 2017, the Court approved an additional $38,236.81 of attorney's fees and expenses for Debtor's counsel. (Dckt. 513).

[33] On March 13, 2017, the Court approved an additional $3,681.25 of fees for the professional services provided by the Debtor's accountant, Kessler.

to the original debtor; (ii) the appointment of such officers and directors be consistent with the interests of the creditors and equity security holders and with public policy; and (iii) the plan proponent disclose the identity and compensation of any insiders to be retained or employed by the reorganized debtor.

Article I of the Second Amended Plan discloses that Edward and Darnett will sign an agreement with the Debtor to manage the Mableton Complex post-confirmation for a fee of $2,170.00 per month. (Dckt. 466, p.1). In addition, the Colemans have agreed to waive this fee in any month the Debtor needs the funds to make its plan payments. *Id.* Accordingly, the Court concludes that the Debtor has complied with § 1129(a)(5).

### H. 11 U.S.C. § 1129(a)(6)

Section 1129(a)(6) requires that any regulatory commission having jurisdiction over the rates charged by the reorganized debtor has approved any rate changes provided for in the plan. The Debtor does not charge any rates subject to regulatory approval, and thus § 1129(a)(6) is not applicable.

### I. 11 U.S.C. § 1129(a)(7)

Section 1129(a)(7), more commonly known as the "best-interest-of-creditors test," requires that "with respect to each impaired class, the class must unanimously accept the plan or each holder of a claim within the class must receive under the plan at least what such holder would receive under a Chapter 7 liquidation." *In re Trenton Ridge Investors LLC*, 461 B.R. 440, 473-74 (Bankr. S.D. Ohio 2011). In this case, the only non-accepting impaired class is Class 1, which is comprised solely of Rincon's secured claim.

It is not in dispute that Rincon's claim is oversecured, and thus Rincon would likely receive a 100% distribution in a chapter 7 liquidation of the Debtor. However, the Second Amended Plan also provides that Rincon's claim will be paid in full, with interest, albeit over an extended period of time. Because Rincon would receive under the Second Amended Plan at least as much as it would receive in a Chapter 7 liquidation, the Court concludes that § 1129(a)(7) has been satisfied.

J. 11 U.S.C. § 1129(a)(8)

Section 1129(a)(8) provides that "[w]ith respect to each class of claims or interests – such class has accepted the plan; or such class is not impaired under the plan." 11 U.S.C. § 1129(a)(8). In this case, only one impaired class – Class 1 (comprised of Rincon's secured claim) – did not accept the Second Amended Plan. However, the Court may still confirm the Second Amended Plan if it satisfies the cramdown provisions of 11 U.S.C. § 1129(b) with respect to Rincon's secured claim. Under § 1129(b), the Court must confirm a Chapter 11 plan if: (1) "all applicable requirements of subsection (a) of this section other than paragraph (8) are met" and (2) the plan "does not discriminate unfairly, and is fair and equitable, with respect to each class of claims or interests that is impaired under, and has not accepted, the plan." 11 U.S.C. § 1129(b)(1). Here, Rincon argues that the Second Amended Plan does not provide for the "fair and equitable" treatment of its secured claim. (Dckt. 506).

Pursuant to 11 U.S.C. § 1129(b), a plan is "fair and equitable" with respect to a class of secured claims if it provides:

(i)(I) that the holders of such claims retain the liens securing such claims, whether the property subject to such liens is retained by the debtor or transferred to another entity, to the extent of the allowed amount of such claims; and

(II) that each holder of a claim of such class receive on account of such claim deferred cash payments totaling at least the allowed amount of such claim, of a value, as of the effective date of the plan, of at least the value of such holder's interest in the estate's interest in such property;

＊          ＊          ＊

11 U.S.C. § 1129(b)(2)(A)(i)(I)-(II). There is no dispute that Rincon will retain its pre-petition lien under the Second Amended Plan[34]. However, Rincon argues that the Second Amended Plan fails to provide Rincon with deferred cash payments equal to the present value of its secured claim.

A secured creditor receives the present value of its claim if the deferred payments, discounted to present value by applying an appropriate interest rate, equals the allowed amount of the secured creditor's claim. *J.C. Householder*, 501 B.R. 441. To determine an appropriate interest rate in a Chapter 11 cramdown case, a vast majority of courts, including the Eleventh Circuit Court of Appeals[35], use the Supreme Court's "prime-plus" formula established in *Till v. SCS Credit Corp.*, 541 U.S. 465 (2004). However, some courts first recognize that the "prime-plus" formula should only be applied where an efficient market [36] for the cramdown loan does not exist. *See In re Brice Rd. Developments, LLC*, 392 B.R. 274, 280 (6th Cir. BAP 2008). In this case, neither the Debtor, nor Rincon, has provided

---

[34] Article VII of the Second Amended Plan provides that "nothing contained in the Plan shall affect the rights of creditors holding valid security deeds over real property of the Debtor or on any duly perfected security interest in personal property of the Debtor." (Dckt. 466, Art. VII).

[35] *See In re Seaside Engineering & Surveying, Inc.*, 780 F.3d 1070, 1083 (11th Cir. 2015).

[36] In *Till*, which involved a Chapter 13 case, the Supreme Court noted that "when picking a cramdown rate in a chapter 11 case, it might make sense to ask what rate an efficient market would produce." *Till*, 541 U.S. at 476, n. 14.

the Court with sufficient evidence of the existence of an efficient market for the cramdown

loan proposed in the Second Amended Plan. Accordingly, the Court will apply the "prime-

plus" formula established by the Supreme Court in *Till*.

To determine an appropriate cramdown interest rate using the "prime-plus"

formula, the Court must look to the national prime rate and provide some upward adjustment

to account for a debtor's increased likelihood of default. *Till*, 541 U.S. at 479. The *Till* Court

stated that the burden of proof on any upward adjustment to the prime rate is "squarely on

the creditors." *Id.*; *see also In re Moultonborough Hotel Group, LLC*, 2012 WL 5464630 at

*7 (Bankr. D. N.H. 2012) (finding the burden of proof on any upward adjustment to the

prime rate is on the creditor); *In re Pamplico Highway Development, LLC*, 468 B.R. 783, 792

(Bankr. D. S.C. 2012) ("burden of establishing the proper risk adjustment is borne by the

creditor").

Courts generally apply a 1% to 3% upward adjustment depending on "the

circumstances of the estate, the nature of the security, and the duration and feasibility of the

reorganization plan. *Till*, 541 U.S. at 479. In addition, some courts evaluate the quality of the

debtor's management, the commitment of the debtor's owners, and the health and future

prospects of the debtor's business. *In re LMR, LLC*, 496 B.R. 410, 430 (Bankr. W.D. Tex.

2013).

Alternative "B" of the Second Amended Plan provides Rincon with deferred

payments over ten years at an interest rate of 4.75%[37], which was 1% above the national

---

[37] Alternative "A" provides Rincon with deferred payments over twenty years at an
interest rate of 5.25%. Since the Court finds 4.75% an appropriate cramdown interest rate for a

prime rate at the time of the February 28, 2017 confirmation hearing[38]. At the confirmation hearing, Rincon argued that the risk adjustment should be no less than 3% due to the risk associated with a long-term payout and the risk of an increase in interest rates. However, Rincon provided the Court with little evidence in support of such a risk adjustment. After applying the *Till* factors to this case, the Court finds that the Debtor's proposed cramdown interest rate of 4.75% is appropriate.

Since filing for Chapter 11, the Debtor has demonstrated an ability to generate a profit. During the two years this case has been pending, the Debtor has accumulated over $100,000.00[39] in cash (excluding security deposits) even after making post-petition payments totaling $458,972.10 to Rincon and $19,474.56 to Janice Erickson. (Dckt. 527).

Rincon's collateral – the Mableton Complex – is an income-producing property with historically low vacancy rates. The Court has not been presented with any evidence that the condition and value of the Mableton Complex will significantly deteriorate during the life of the Second Amended Plan. In fact, the Debtor's budget includes funds to adequately repair and maintain the property. Further, the parties' appraisers suggested at the Court's valuation hearing on the Mableton Complex that there is a strong rental market in Rincon, Georgia.

---

ten-year payment period, the Court also finds that a cramdown interest rate of 5.25% is sufficient, even accounting for the extended payment period of twenty years.

[38] On March 15, 2017, the Federal Reserve raised the federal funds rate, which resulted in an increase of the national prime rate to 4.00%. *See* Federal Reserve Statistical Release H-15 (May 3, 2017).

[39] As of April 30, 2017, the Debtor had $61,968.91 of funds available for repairs and maintenance to the Mableton Complex (e.g. roof repairs and HVAC replacement) and $14,759.29 in its tax escrow account. (Dckt. 527, p. 5).

As will be discussed more fully below, the Debtor has provided evidence that it is feasible for the Debtor to make all of its plan payments proposed in the Second Amended Plan. Any risk that the Debtor may default on such payments is mitigated by the availability of funding from the Colemans and Auto Shine. Further, the Colemans have demonstrated a strong commitment to the reorganization of the Debtor. Since the Debtor filed for bankruptcy, the Colemans have taken over the management duties at the Mableton Complex and have eliminated various unnecessary expenses. In addition, the Colemans have agreed to waive their $2,170.00 management fee whenever such funds are needed by the Debtor.

In summary, the Court finds the Debtor's proposed cramdown interest rate of 4.75% for Rincon's secured claim is sufficient to provide Rincon with the "present value" of its claim under the *Till* approach. Therefore, the Second Amended Plan satisfies the cramdown requirements of § 1129(b)(2)(A)(i)(II) and may be confirmed over the objection of Rincon.

K. 11 U.S.C. § 1129(a)(9)

Section 1129(a)(9) requires that the holder of an administrative claim be paid "cash equal to the allowed amount of such claim" on the effective date of the plan, unless the claimant agrees to different treatment. 11 U.S.C. § 1129(a)(9)(A). "The Code clearly requires the full payment of all allowed administrative expenses." *In re TCI 2 Holdings, LLC*, 428 B.R. 117, 173 (Bankr. D. N.J. 2010); *see also In re Christopher*, 28 F.3d 512, 516 (5th Cir. 1994) ("[T]he plan of reorganization cannot be confirmed under § 1129(a)(9)(A) unless the plan provides for the payment in cash and in full of persons holding 'claims' for

administrative expenses under §§ 503 and 507."). In this case, the following claimants hold allowed administrative claims: the Debtor's attorney ($202,727.14 approved to date[40], of which $86,252.12 remains unpaid[41]), the Debtor's accountant ($7,718.75 approved to date[42]) and the Debtor's appraisers ($7,338.75 approved to date[43]). Accordingly, in order to be confirmed, the Second Amended Plan must provide that each of these claimants will be paid cash equal to the allowed amount of his or her claim on the plan's effective date unless the claimant has agreed otherwise. 11 U.S.C. § 1129(a)(9)(A).

Article IV of the Second Amended Plan provides detailed information regarding the Debtor's payment of administrative claims prior to confirmation and discloses potential sources of funds from which to pay administrative claims post-confirmation. (Dckt. 466, Art. IV). Inexplicably, the Second Amended Plan is silent as to whether the administrative claims will be paid on the effective date or whether the administrative claimants have agreed to different treatment.

At the February 28, 2017 hearing, the Debtor's attorney, H. Lehman Franklin, Jr., expressed to the Court that he would allow the Debtor to pay his administrative claim

---

[40]*See* Dckts. 162, 240, 342, 513.

[41]Of the attorney's fees and expenses awarded to Debtor's counsel, the Court estimates that $86,252.12 remains unpaid. According to the Second Amended Plan, the Debtor paid counsel a pre-petition retainer of $37,250.02. (Dckt. 466, p. 8). At the February 28, 2017 confirmation hearing, the Colemans testified that Auto Shine had made $46,000.00 of post-petition payments to Debtor's counsel (as of January 13, 2017). (2/28/17 Hrg., Ex. D-9). Further, after a review of the Debtor's monthly operating reports, it appears that the Debtor has paid its counsel a total of $33,225.00 post-petition (as of April 30, 2017). (Dckt. 527).

[42]*See* Dckts. 163, 263, 516.

[43]*See* Dckts. 103, 343.

AO 72A
(Rev. 8/82)

over a period of time after confirmation. However, no testimony or evidence was presented as to how or when the claims held by the Debtor's accountant and appraisers will be paid. Accordingly, the Second Amended Plan, as currently proposed, does not satisfy the requirements of 11 U.S.C. § 1129(a)(9). However, the Court is confident that the failure to comply with this confirmation requirement was nothing more than an oversight by Debtor's counsel and one that may be easily corrected[44]. The Court will allow the Debtor an opportunity to supplement its Second Amended Plan to explicitly provide that allowed administrative claims will be paid in full on the plan's effective date or to disclose that the holders of administrative claims have agreed to a different treatment of their claims.

### L. 11 U.S.C. § 1129(a)(10)

Under § 1129(a)(10), "[i]f a class of claims is impaired under the plan," then it must be the case that "at least one class of claims that is impaired under the plan has accepted the plan, determined without including any acceptance of the plan by any insider." 11 U.S.C. § 1129(a)(10). In this case, three impaired classes of claims (Classes 2, 4 and 6), none of which contain the claims of insiders, have accepted the Second Amended Plan. Accordingly, the Debtor has satisfied the confirmation requirements set forth in § 1129(a)(10).

### M. 11 U.S.C. § 1129(a)(11)

Under § 1129(a)(11), the Court is required to determine that "[c]onfirmation

---

[44]Based on the evidence in the record, it appears that the Debtor has cash on hand from which to pay the claims held by its accountant and appraisers. (Dckt. 504). Further, based on the lack of objection, it is possible that the Debtor's accountant and appraisers have agreed to a different treatment of their administrative claim.

of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan, unless such liquidation or reorganization is proposed in the plan." Although the Bankruptcy Code does not use the terms "feasible" or "feasibility," the requirements set forth in § 1129(a)(11) are commonly known as the "feasibility test."

"The purpose of the feasibility test is to determine whether there is a reasonable probability that creditors will receive the payments provided for in the proposed plan." *In re Trenton Ridge Investors, LLC*, 461 B.R. 440, 478 (Bankr. S.D. Ohio 2011). To make this determination, courts often consider the following factors: (1) the earning power of the business; (2) its capital structure; (3) the economic conditions of the business; (4) the continuation of present management; and (5) the efficiency of management in control of the business after confirmation. *United States v. Haas (In re Haas)*, 162 F.3d 1087, 1090 (11th Cir. 1998).

When evaluating these factors, the Court need not find that a proposed plan is guaranteed to succeed. "The [Bankruptcy] Code does not require the debtor to prove that success is inevitable, and a relatively low threshold of proof will satisfy § 1129(a)(11) so long as adequate evidence supports a finding of feasibility." *Brice Road Developments*, 392 B.R. at 283. The plan proponent must only prove that the plan provides "a realistic and workable framework for reorganization." *In re Made in Detroit, Inc.*, 299 B.R. 170, 177 (Bankr. E.D. Mich. 2003); *In re Oaks Partners, Ltd.*, 141 B.R. 453, 458 (Bankr. N.D. Ga. 1992) (stating that the feasibility test involves "a finding of reasonable probability of actual

performance of the plan").

Based on a careful consideration of all of the testimony and other evidence presented, the Court concludes that the Debtor has met its burden of proof that the Second Amended Plan has a reasonable prospect of success and is workable. Therefore, the Court finds that the Second Amended Plan complies with § 1129(a)(11). The Court will address below the factors relevant to its feasibility determination.

### 1. The Debtor's Earning Power

The five-year financial projections presented by the Debtor's accountant, Kessler, indicate that the Debtor has the earning power to pay all of its proposed plan payments without the need for third-party contributions. According to Kessler's 2017 projections, the Debtor's monthly rental income from the Mableton Complex ($39,517.50) and the Seines Landing Property ($1,000.00) less its operating expenses ($16,336.00) and capital improvements reserve ($2,500.00) exceed the amount necessary to make the plan payments proposed under Alternative "A" ($21,150.17) and Alternative "B" ($20,444.46) of the Second Amended Plan.

The Debtor argues that Kessler's income projections are reliable because they are consistent with the actual rental income generated by the Debtor post-petition and account for the anticipated increase in rental rates at the Mableton Complex. Kessler's projection of monthly rental income of $39,517.50[45] from the Mableton Complex in 2017 is

---

[45]This figure is based on the rental of 49 units at $850.00 per unit ($41,650.00) and provides for a deduction of $2,135.50 based on Kessler's projected vacancy rate of 4% at the Mableton Complex.

supported by a review of the Debtor's monthly operating reports, which reveal that the Debtor generated an average of roughly $38,287.00 per month (for only 48 units) in rental income from the Mableton Complex[46]. Kessler also projects that the Debtor's monthly rental income from the Mableton Complex will increase to $41,612.25 in 2018 and will again increase in 2020 to $43,008.75[47]. The Court finds these projections of increased rental income reasonable because Darnett has testified that the Debtor will begin charging new tenants at the Mableton Complex an increased rental rate of $925.00.

The Court also finds Kessler's operating expense projections reasonable. In fact, a comparison of certain of Kessler's projected monthly operating expenses and the Debtor's average monthly operating expenses since filing for bankruptcy[48] shows that Kessler's projections are slightly conservative:

---

[46] This estimate is based upon the Court's review of the Debtor's monthly operating reports from March 2015 (dckt. 96) to April 2017 (dckt. 527). The Court did not consider the Debtor's January 2015 and February 2015 operating reports because they do not provide a reliable figure for the rental income generated from the Mableton Complex in those months. The January report is only for a two-day period and the February report provides two conflicting rent rolls.

[47] Kessler's 2018 and 2019 projections are based on a rental rate of $895.00, and his 2020 and 2021 projections are based on a rental rate of $925.00. Again, these projections provide for the availability of a 49th rental unit and assume a vacancy rate of 4%.

[48] The Court calculated the Debtor's average expenses by taking the "Cumulative Petition to Date" figure for each applicable category in the Debtor's April 2017 Monthly Operating Report (dckt. 527) and dividing it by 27 months (February 2015 to April 2017).

Table 3: Comparison of Kessler's Projections to Debtor's Operating Expenses

| Operating Expense | Kessler's Projection | Debtor's Average Expense |
|---|---|---|
| Advertising | $ 150.00 | $ 144.00 |
| Bank Fees | $ 40.00 | $ 35.00 |
| Insurance | $ 2408.00 | $ 2290.00 |
| Professional Fees | $ 1400.00 | $ 1348.00 |
| Repair & Maintenance | $ 7500.00 | $ 7348.00 |
| Utilities | $ 1600.00 | $ 1511.00[A] |
| Office Supplies / Misc. | $ 500.00[B] | $ 400.00 |
| Property Taxes | $ 2738.00 | $ 2228.00 |

[A] This figure includes both the "Telephone" and "Utilities" categories provided in the April 2017 operating report.
[B] This figure includes both the "Office Supplies" and "Miscellaneous" categories provided in Kessler's projections.

Rincon argues that the Court should not rely on Kessler's projections because they fail to give any weight to certain expenses that the Debtor regularly incurred prior to bankruptcy. However, since filing for bankruptcy, the Debtor has not incurred such expenses and the Colemans have testified that the Debtor will continue to refrain from doing so post-confirmation. Thus, it is reasonable for Kessler to have excluded these pre-petition expenses from his projections. Rincon also argued that Kessler should have included the $2,170.00 management fee paid to the Colemans as an operating expense. However, the exclusion of this expense is reasonable, at least for purposes of assessing feasibility, because the Colemans testified that they have agreed to waive such fee in any month in which the Debtor needs the funds to make its plan payments.

Based on Kessler's projections, which the Court finds both reliable and

reasonable, the Debtor will likely have sufficient monthly income to fund all of its plan payments without the need for third-party contributions. Accordingly, the Court finds that the Debtor's earning power weighs in favor of a finding that the Second Amended Plan is feasible.

The Debtor's history of payments to its secured creditors while in bankruptcy also weighs in favor of a finding of feasibility. The Debtor's April 2017 Monthly Operating Report (dckt. 527) indicates that, since entry of the cash collateral order of February 13, 2015 (dckt. 58), the Debtor has made an average monthly payment of $17,299.89 to Rincon (a total of $449,797.21). In addition, the Debtor has made a monthly payment of $721.28 to creditor Janice Erickson (a total of $19,474.56) since filing for bankruptcy over two years ago. Because these payments are very nearly the same as the proposed plan payments to Rincon and Janice Erickson[49], the Court finds it reasonable that the Debtor will continue to timely pay these secured creditors over the life of the plan.

### 2. The Debtor's Post-Confirmation Management

Since the Colemans took over the management duties of the Mableton Complex, the Debtor has been able to make its post-petition payments to secured creditors and accumulate nearly $100,000.00 in its bank accounts. The Court has been presented with no evidence that the Colemans' dedication to managing the Mableton Complex will falter during the life of the Second Amended Plan. In fact, the Colemans testified that they will

---

[49] Under Alternative "A", the Debtor proposes to pay Rincon $17,216.72 per month. Under Alternative "B", the Debtor proposes to pay Rincon $16,511.01 per month. The Debtor proposes to pay Janice Erickson $901.60 per month for the first four months and $721.28 thereafter.

continue to manage the Mableton Complex post-confirmation and have further agreed to waive, if necessary, the $2,170.00 management fee they currently receive from the Debtor. The Court finds that the Colemans' dedication to the Debtor weighs in favor of a finding of feasibility.

### 3. Third-party Contributions

The Second Amended Plan provides that Edward will sign a $50,000.00 promissory note to the Debtor and deposit the funds necessary to satisfy the note on or before the date of a confirmation hearing on the plan. At the February 28, 2017 confirmation hearing, Edward testified that he had already signed the promissory note and paid the $50,000.00 to Debtor's counsel. (2/28/17 Hrg., Ex. D-13). Accordingly, Edward has already met his obligations under the Second Amended Plan[50].

The Second Amended Plan provides that Auto Shine will make the $1,666.67 monthly payments to Macomber and contribute $830.81 towards the plan payments each month until its $100,000.00 promissory note to the Debtor is satisfied. The $830.81 will be used to make the proposed plan payments to Class 4 ($568.81) and Class 5 ($229.17[51]), as well as a portion of the Class 1 payment ($32.83). Based on the testimony of Darnett, which

---

[50] The Court has been made aware that Rincon has a pending lawsuit against Edward in state court seeking a judgment on his personal guaranty of the Mableton Complex debt. That state court litigation, which is at the summary judgment stage, may greatly affect Edward's ability to contribute to the Debtor's reorganization. But the Court will not speculate as to how that personal liability might impact feasibility. It is enough to say that the Court has taken that state court litigation into consideration.

[51] Once the Class 5 claims are satisfied, the Debtor will contribute the $229.17 towards the Class 1 payment.

the Court finds reliable[52], it is reasonable to conclude that Auto Shine will be able to make all of its proposed contributions under the Second Amended Plan.

Darnett testified that Auto Shine has been making the $1,666.67 monthly payment to Macomber since September 1, 2015, without experiencing any financial hardship. (2/28/17 Hrg., Ex. D-8). In addition, Darnett testified that the additional $830.81 contribution would result in a minimal impact on Auto Shine's finances. With respect to Auto Shine's financial condition, Darnett testified that Auto Shine increased its gross sales in 2016 by nearly $300,000.00 and she expects that sales will continue to grow in 2017 due to a planned price increase at the car washes, which was set to begin in April 2017. (2/28/17 Hrg., Ex. D-7). In addition, Darnett testified that Auto Shine has recently entered into an agreement to wash cars for a car dealership in Statesboro, Georgia that will further increase Auto Shine's revenues. Auto Shine's ability to make its proposed contributions is arguably strengthened by Edward's testimony that the Bank of Newington has committed to provide Auto Shine with a letter of credit in the amount of the proposed $100,000.00 promissory note. (2/28/17 Hrg., Ex. D-12). Notwithstanding this testimony, the Court placed little weight on this letter of credit in evaluating feasibility.

Based on the Colemans' testimony, the Court finds that Edward and Auto Shine will be able to make their proposed contributions under the Second Amended Plan. Accordingly, on balance, this factor supports a finding that the Second Amended Plan is feasible.

---

[52]Darnett serves as the bookkeeper for Auto Shine. Accordingly, the Court finds that Darnett is sufficiently familiar with Auto Shine's finances.

### 4. The Balloon Payment

Alternative "B" of the Second Amended Plan calls for the Debtor to make a balloon payment of the remaining balance of Rincon's claim ten (10) years after the plan's effective date. Until then, the Debtor will make payments based on a twenty-year amortization. The Second Amended Plan does not describe how the Debtor plans to obtain the funds necessary to make such balloon payment. However, this does not necessarily render the Second Amended Plan infeasible or incapable of being confirmed. *See SPCP Group, LLC v. Cypress Creek Assisted Living Residence, Inc.*, 434 B.R. 650 (M.D. Fla. 2010) (finding that the bankruptcy court did not err in determining that the proposed balloon payment was feasible despite the plan failing to specify how the balloon payment would be funded); *see also In re SM 104 Ltd.*, 160 B.R. 202, 238-39 (Bankr. S.D. Fla. 1993) (finding it unnecessary for the debtor to explain how it will obtain the funds to make the proposed balloon payment because "it is clear that [the debtor] will be able to fund a large part of the balloon from its operations if it is able to meet its projections.")

Assuming the Debtor makes all of its proposed plan payments, the Court estimates that the Debtor will have paid down nearly $1 million of principal on Rincon's secured claim in the next ten years[53]. Based on the Court's $2,480,000.00 valuation of the Mableton Complex and assuming such value will not change substantially over the next ten years, the Court estimates that the property will be worth approximately 1.44 times the

---

[53]This estimate is based on a twenty-year amortization of $2,555,000.00 at 4.75% interest.

%AO 72A
(Rev. 8/82)

remaining debt owed to Rincon and Macomber[54]. Thus, the Court finds it reasonable that a lender would be willing to refinance the Mableton Complex with a loan that would have an estimated loan-to-value ratio of about 56%. Accordingly, this factor weighs in favor of a finding of feasibility.

The Court will make one final observation regarding feasibility of the Debtor's Second Amended Plan. The attorney's fees and expenses awarded to Debtor's counsel for work done through January 26, 2017, have surpassed $200,000.00, of which approximately $86,000.00 remains unpaid. Rincon's expert, York, added into his cash flow analysis the sum of $3,378.00 per month to pay these fees over a 36-month period. Kessler's operating expense projections include an "Accounting and Legal" budget of $1,400.00 per month. If Debtor's counsel pursues collection of its fees post-confirmation at a more accelerated pace, that could certainly impact feasibility. But the Court finds that counsel does not intend to collect more fees than the Debtor or the Colemans can afford to pay. Otherwise, this entire exercise will have been for naught.

N. 11 U.S.C. § 1129(a)(12)

Section 1129(a)(12) requires that "[a]ll fees payable under section 1930 of title 28, as determined by the court at the hearing on confirmation of the plan, have been paid or the plan provides for the payment of all such fees on the effective date of the plan." 11 U.S.C. § 1129(a)(12). The Second Amended Plan provides for the payment of all outstanding quarterly fees under 28 U.S.C. § 1930(a) on or before the plan's effective date. (Dckt 466,

---

[54] At the end of the ten-year period, Macomber's claim secured by the Mableton Complex will have a remaining balance of approximately $166,666.67.

Art. IV, ¶ 2). Thus, the Second Amended Plan complies with § 1129(a)(12).

O. 11 U.S.C. §§ 1129(a)(13) to (a)(16)

The remaining provisions of § 1129(a) do not apply in this case. Subsection (a)(13) applies to certain retiree benefits, subsection (a)(14) applies to domestic support obligations, subsection (a)(15) applies only to individual debtors, and subsection (a)(16) applies only to nonprofit entities.

## IV. CONCLUSION

In this cramdown case, it is the Debtor's burden to prove, by a preponderance of the evidence, that all of the required elements of 11 U.S.C. §§ 1129(a) and (b) have been met. Rincon argued that the Court should deny confirmation because the Debtor has failed to demonstrate that the Second Amended Plan is feasible as required by § 1129(a)(11) and that it does not provide for the "fair and equitable" treatment of Rincon's secured claim as required by § 1129(b)(1).

With respect to feasibility, the Court is satisfied that the Debtor's post-confirmation income will likely be sufficient to service all of the proposed plan payments without the need for third-party contributions. The availability of third-party funds from the Colemans and Auto Shine only bolsters the Court's finding as to feasibility. Once the Debtor is no longer embattled in this confirmation litigation, the Court has no doubt that the Colemans, on behalf of the Debtor, will direct all of their attention to the business and make this reorganization successful.

The Court also finds that the proposed cramdown interest rates on Rincon's

secured claim satisfy the "fair and equitable" requirement of 11 U.S.C. § 1129(b)(1). Apart from the risk inherent in any loan (e.g. interest rate risk), the Court finds that there is minimal risk associated with Debtor. Throughout its over two years in bankruptcy, the Debtor has serviced Rincon's debt without incident, has timely paid all of its post-petition operating expenses, has set aside funds for repairs and taxes, and has still been able to accumulate cash. Accordingly, the Debtor has demonstrated that the Second Amended Plan is both feasible and provides for the "fair and equitable" treatment of Rincon's claim.

However, after an independent review of the Second Amended Plan, the Court discovered that it does not satisfy the requirements of § 1129(a)(9) relating to the mandatory treatment of administrative claims. Because this may be easily remedied, the Court will enter an order instructing the Debtor to promptly file a supplement to the Second Amended Plan that satisfies § 1129(a)(9). Once filed, the Court will enter an order granting confirmation of the Debtor's Second Amended Plan.

Upon confirmation, the Court will set a hearing on Rincon's Application of Oversecured Creditor for Allowance of Professional Fees and Costs (dckt. 470) to determine the amount of attorneys' fees, if any, that Rincon is entitled to add to its secured claim pursuant to 11 U.S.C. § 506(b). If entitled, Rincon may only add attorneys' fees to the extent of the value of its collateral, which the Court has determined to be $2,598,758.24. As provided in the Second Amended Plan[55], any upward adjustment to Rincon's secured claim

---

[55] With respect to Rincon's claim, the Second Amended Plan provides that "[s]hould the value of collateral as determined by the Court at confirmation be a different amount [than $2,555,000.00], the payments shall be adjusted accordingly." (Dckt. 466, p. 5).

(above the Debtor's estimated claim amount of $2,555,000.00) will result in a change to the amortization of Rincon's claim.

Dated at Savannah, Georgia, this 7th day of June, 2017.

Edward J. Coleman, III, Judge
United States Bankruptcy Court
Southern District of Georgia